## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SONYA GENDRON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:22-cv-11910-JEK |
| DR. AMJAD KINJAWI and | ) | |
| AMJAD KINJAWI, P.C., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER ON PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT

**KOBICK, J.**

Plaintiff Sonya Gendron worked for four months in 2021 at defendant Amjad Kinjawi, P.C., d/b/a Unique Dental, a dental practice owned by defendant Amjad Kinjawi. While there, she had a range of job responsibilities, including office management and patient care, and was developing a proposal with recommendations for improving the productivity of the dental hygienists. She was fired in June 2021 immediately following a brief meeting between her, Dr. Kinjawi, and Gendron's friend, Jacqueline Tyler. At that meeting, Tyler had criticized Dr. Kinjawi's management of the practice and underpayment of Gendron.

Gendron brought suit in 2022 claiming, among other things, that she was misclassified as an independent contractor instead of as an employee while she worked at Unique Dental; that the defendants violated her right to timely and full wages under the Massachusetts Wage Act, M.G.L. c. 149, § 148; and that the defendants failed to pay her minimum wage and overtime pay, and retaliated against her, in violation of Massachusetts law and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* Pending before the Court is Gendron's motion for summary judgment as to

liability on four of those claims. That motion will be granted in part and denied in part. The Court concludes that the defendants misclassified Gendron as an independent contractor, violated her right to timely and full payment of wages, and failed to pay her the overtime pay required by M.G.L. c. 151, § 1A. She is thus entitled to judgment as to liability on Counts 1, 2, and 5 of her complaint. The Court will deny her motion as to her claim of retaliation under M.G.L. c. 149, § 148A, because the defendants have shown a dispute of material fact as to whether Gendron was fired because of her complaint to Tyler about the defendants' wage law violations.

## BACKGROUND

The following facts are either undisputed or recounted in the light most favorable to the defendants, as the non-moving parties, where supported by record evidence. *See Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023). Where the defendants have admitted facts in their answer to Gendron's complaint, those facts are treated as undisputed, notwithstanding the defendants' efforts to walk back some of their admissions in opposing Gendron's statement of undisputed material facts. *See Harrington v. City of Nashua*, 610 F.3d 24, 31 (1st Cir. 2010) ("Ordinarily, a pleading admitting a fact alleged in an antecedent pleading is treated as a binding judicial admission, removing the fact from contention for the duration of the litigation."); *Romero Reyes v. Marine Enters., Inc.*, 494 F.2d 866, 868 (1st Cir. 1974) ("That which a defendant admits in his answer is binding upon him until he withdraws the admission by a proper amended or supplemental pleading." (citation and quotation marks omitted)).

## I.    <u>Gendron's Work at Unique Dental.</u>

Dr. Kinjawi is a dentist who operates Amjad Kinjawi, P.C., d/b/a Unique Dental, a dental practice in Attleboro, Massachusetts. ECF 50, ¶¶ 1-2. He is the President, Treasurer, and sole shareholder of Unique Dental. *Id.* ¶ 3. Gendron is a licensed dental hygienist with nearly twenty

years of experience. *Id.* ¶ 14. From 2000 to 2004, she worked as a dental assistant at Unique Dental. *Id.* ¶¶ 67-69.

In August 2020, and then again in early February 2021, Gendron and Dr. Kinjawi reconnected and met to discuss Gendron's ideas for improving the administration of Unique Dental. *Id.* ¶¶ 70-71, 73; ECF 51-3, at 64-73; ECF 51-4, Answer No. 6. Drawing from her experience working at other dental practices, Gendron shared ideas for specific measures that she could implement to improve the productivity of the two dental hygienists then employed in his office. ECF 50, ¶ 88; ECF 51-1, at 68-71; ECF 51-3, at 70-72. Based on their discussions, Dr. Kinjawi decided to hire Gendron. *See* ECF 50, ¶ 15. Dr. Kinjawi understood, from their meetings, that Gendron would make a proposal to him at some point in the future concerning the specifics of her role, and that in the meantime, she would manage his dental practice and help him with his backlog of insurance claims. ECF 51-1, at 68, 94; ECF 51-4, Answer No. 6. Among the managerial duties he expected her to perform were "[o]verseeing the flow of the patients," "dealing with insurance companies," and calculating and processing patients' copays. ECF 51-1, at 94. He also expected that she would provide direction and training to the other dental hygienists as part of her efforts to improve their performance. *See id.* at 96; ECF 51-3, at 70-71. There was no written agreement between Gendron and Dr. Kinjawi governing the terms of their working relationship or the scope of Gendron's job responsibilities. ECF 50, ¶ 75.

Gendron began working at Dr. Kinjawi's dental practice on February 6, 2021. *Id.* ¶ 16. She had a range of duties, including office management, patient care and dental hygiene care, oversight of dental hygienists and administrative staff, and billing. ECF 1, ¶¶ 14, 17 (Complaint); ECF 7,

¶¶ 14, 17 (Answer); *see* ECF 50, ¶¶ 20, 24, 25, 28.[1] Among the dental hygiene services she provided were adult and child prophylaxis, MI paste, topical fluoride treatment, and gingivitis treatment. ECF 50, ¶¶ 21-22. Gendron did less hygiene work than the two full-time hygienists, but she "would jump in as needed" when they were working or fill in when they were on vacation or not working. *Id.* ¶ 89; ECF 51-3, at 25; *compare* ECF 51-6, at 4 (hygiene work that Gendron billed to insurance), *with* ECF 51-6, at 2-3 (hygiene work that the other two hygienists billed to insurance). Gendron also scheduled Unique Dental's patients and spoke with the other hygienists about patient care. ECF 50, ¶¶ 26-27; ECF 51-1, at 99, 119.

While working for Unique Dental, Gendron developed and implemented several changes to Dr. Kinjawi's practice. ECF 50, ¶¶ 79-87. She ordered new products for Unique Dental to sell, arranged for representatives from dental companies to come demonstrate whitening products, introduced the concept of comprehensive treatment planning and instructed office staff on that topic, implemented the American Dental Association's fluoride standard of care, and devised a new patient experience. *Id.* The record does not disclose the percentage of time Gendron devoted to developing and implementing new ideas versus managing the office, providing dental hygiene care, overseeing hygienists and administrative staff, scheduling patients, and handling billing. Throughout her time there, however, Unique Dental treated Gendron as an independent contractor. *Id.* ¶ 60.

---

[1] These facts were all admitted in the defendants' answer and are therefore "treated as a binding judicial admission, removing the fact from contention for the duration of the litigation." *Harrington*, 610 F.3d at 31. The defendants now attempt to dispute these and other facts, claiming that Gendron's services were performed in connection with her role as a consultant rather than as an employee, or were undertaken for the purpose of preparing a proposal on how to improve Dr. Kinjawi's dental practice. *See* ECF 50, ¶¶ 20, 24-28. But these are legal arguments, not facts, and therefore do not generate genuine disputes of material fact under Federal Rule of Civil Procedure 56(c).

Unique Dental uses a software program called Dentrix to keep track of employees' working hours. *Id.* ¶ 4. It also uses Dentrix to maintain billing records for dental procedures. *Id.* ¶ 5. Drawing from employees' time records in Dentrix, Unique Dental uses a program called Complete Payroll Solutions to generate paychecks or complete direct deposits. *Id.* ¶ 7. Unique Dental pays its employees every two weeks, on Thursdays. *Id.* ¶¶ 8-9.

Dr. Kinjawi assigned Gendron a unique Dentrix ID, "SG22," and a password to access the system. *Id.* ¶¶ 17, 29. Using Dentrix, Unique Dental kept records of the dates and times Gendron worked and billed patients for her dental hygiene services. *Id.* ¶¶ 23, 30. Gendron worked for Unique Dental each calendar week from February 6, 2021 until June 11, 2021. *Id.* ¶ 31. Although she had no specific hours, and Unique Dental did not post a schedule for her, she generally worked while the office was open, "close to or in excess of 40 hours per week." ECF 51-4, Answer No. 6; *see* ECF 50, ¶ 76; ECF 51-3, at 81-82. She had a key to Unique Dental for the purpose of opening and closing the practice, if necessary. ECF 50, ¶¶ 77-78. Unique Dental had constructive knowledge of Gendron's hours of work through the Dentrix records. ECF 1, ¶ 76 (Complaint); ECF 7, ¶ 76 (Answer); *see* ECF 50, ¶ 64. During her time at Unique Dental, Gendron worked more than 40 hours in 11 of the weeks, for a total of 30.5 hours of overtime. ECF 50, ¶¶ 61-63. Unique Dental did not, however, pay Gendron overtime compensation for work in excess of forty hours per week. ECF 1, ¶ 86 (Complaint); ECF 7, ¶ 86 (Answer); *see* ECF 50, ¶ 66.

Throughout her time working, Gendron received health insurance and five checks totaling $14,000 from Unique Dental. ECF 50, ¶¶ 19, 32. These checks were written by Dr. Kinjawi and were drawn on a Bank of America account controlled by Unique Dental. *Id.* ¶ 33. The checks are dated February 26, 2021 ($2,000), March 17, 2021 ($3,000), April 5, 2021 ($3,000), May 1, 2021 ($3,000), and May 24, 2021 ($3,000). *Id.* ¶¶ 34-38. None of these checks was accompanied by a

pay stub. *Id.* ¶ 39. After Dr. Kinjawi terminated Gendron's employment on June 11, 2021, he mailed two additional checks, in the sums of $15,309.89 and $10,000, to the address he had on file for her. *Id.* ¶¶ 56, 106.[2] Dr. Kinjawi mailed the first check on June 11 or June 12, 2021, but he included no pay stub, did not tell Gendron he was mailing the check, and had no way of tracking the check. ECF 51-1, at 150. He wrote out the second check over a month later, on July 27, 2021. *Id.* at 151. Neither of these mailed checks was ever cashed. ECF 50, ¶ 57. The following year, Unique Dental issued an "IRS Form 1099" to Gendron for $14,000, and did not make any withholdings, including for taxes, from her pay. *Id.* ¶¶ 58-59.

## II.    Gendron's Termination from Unique Dental.

Before and during her time working for Unique Dental, Gendron discussed strategies to improve Unique Dental's performance and productivity with her friend and former colleague, Jacqueline Tyler. *Id.* ¶¶ 41, 74; ECF 51-5, at 34-36. Tyler has a background in dental hygiene and a master's degree in organizational leadership. ECF 50, ¶ 74; ECF 51-5, at 26. In 2020, she worked with Gendron on a proposal describing best practices for dental hygiene departments, and Gendron gave that proposal to another dentist. ECF 51-5, at 73-74. Tyler and Gendron also discussed putting together a proposal that would be presented to Unique Dental, but the record is unclear whether any such proposal was created. *See* ECF 50, ¶ 91; ECF 51-5, at 63-65, 77-79.

On June 11, 2021, Dr. Kinjawi and Gendron participated in a video meeting on the Zoom platform with Tyler. ECF 50, ¶ 42. Dr. Kinjawi and Gendron attended the meeting together from

---

[2] Gendron's complaint alleged, and the defendants' answer admitted, that "Dr. Kinjawi summarily terminated Ms. Gendron's employment." ECF 1, ¶ 47 (Complaint); ECF 7, ¶ 47 (Answer). Further, in his interrogatory responses, Dr. Kinjawi averred that "Gendron had been terminated on June 11, 2021," and that "Unique Dental fired Ms. Gendron." ECF 51-4, Answer Nos. 11-12. These facts are thus admitted, notwithstanding the defendants' late-stage effort to claim merely that "Dr. Kinjawi ended his business relationship with the Plaintiff." ECF 50, ¶¶ 55, 103.

Unique Dental's office, while Tyler joined remotely. *Id.* ¶¶ 43-44. Before the meeting, Tyler wrote in an email to Gendron and Dr. Kinjawi that she looked forward to meeting and developing a strategy for Unique Dental to prosper. *Id.* ¶ 101; ECF 51-10. Dr. Kinjawi had not previously met or spoken with Tyler, and he understood that, at the meeting, Gendron and Tyler would present a business proposal to him. ECF 50, ¶¶ 97, 99-100. Going into the meeting, Dr. Kinjawi had no intention of changing or reducing Gendron's services. *Id.* ¶ 45.

Gendron had spoken with Tyler before the June 11, 2021 meeting about how she was being paid only sporadically by Unique Dental. *Id.* ¶ 46; *see* ECF 51-5, at 61-62, 92-94. Tyler knew that Gendron was being paid in a "piecemeal" fashion, and she believed that Gendron was "making under minimum wage." ECF 51-5, at 62. From these conversations, Tyler testified, she "knew that [Gendron's wages were not] enough for her to live on," and she wanted Gendron to "communicat[e] that she's got to live" and have enough "money to pay her mortgage." *Id.* at 93-94. Tyler did not, however, know the details of the "payment arrangement" between Gendron and Dr. Kinjawi. *Id.* at 62, 93-94. The defendants dispute whether Gendron's financial hardship was solely attributable to Unique Dental, and they point out that Gendron was receiving unemployment compensation while she was working for Unique Dental. ECF 50, ¶ 46.

Tyler began the June 11 meeting by praising Gendron and blaming Dr. Kinjawi for Unique Dental's underperformance. ECF 51-1, at 139-40. She then informed Dr. Kinjawi that Gendron was being underpaid, by saying either that he was "paying her pennies" or less than minimum wage. *Id.* at 140-41; *see* ECF 50, ¶ 102; ECF 51-3, at 118. Dr. Kinjawi had a negative reaction to these comments. He "took offense" to the way Tyler conveyed her comments about Gendron's compensation, because he thought it was "not . . . the case" that Gendron was being underpaid. ECF 51-1, at 141. This meeting "was the first time [he had heard] about the money issue," and he

worried that Gendron might be sharing confidential information with Tyler. *Id.* at 141-42 (testifying that he was "bother[ed] by "[h]ow much this lady knows about the practice or how much Sonya was possibly just sharing with her about the practice, which part of it could be confidential"). Dr. Kinjawi also believed that if Gendron "was concerned that she wasn't being paid minimum wage or that she was being paid pennies," she should have "address[ed] it with him," and that "it wasn't appropriate for her to tell someone else." *Id.* at 142-43; *see* ECF 50, ¶ 50.

Upon hearing Tyler's comments, Dr. Kinjawi declared that the meeting was over, left the room, and started walking toward his office. ECF 50, ¶ 51; ECF 51-1, at 144-45. The meeting had lasted approximately 15 minutes. ECF 50, ¶ 52. Gendron followed after him, and Dr. Kinjawi told her that the relationship between them was not working. *Id.* ¶ 54. He thus terminated her employment at Unique Dental, and she left the office within 15 or 20 minutes of her firing. ECF 1, ¶ 47 (Complaint); ECF 7, ¶ 47 (Answer); ECF 51-1, at 146-47; ECF 51-4, Answer Nos. 11-12. At that time, Gendron did not know what the minimum wage was, nor can she now remember if she determined in 2021 whether she was being paid the minimum wage. ECF 50, ¶¶ 104-05.

### III.    Procedural History.

Gendron filed this lawsuit against Dr. Kinjawi and Unique Dental in November 2022. ECF 1. Against both defendants, her complaint asserts eight counts: misclassification as an independent contractor instead of as an employee, in violation of M.G.L. c. 149, § 148B (Count 1); a violation of M.G.L. c. 149, § 148, for failure to pay timely wages (Count 2); retaliation, in violation of M.G.L. c. 149, § 148A (Count 3); violations of M.G.L. c. 151, §§ 1 and 1B, for failure to pay minimum wage and overtime wages (Counts 4 and 5, respectively); and violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, for failure to pay minimum wage, failure to pay overtime wages, and retaliation for complaining about unpaid wages (Counts 6, 7, and 8,

respectively). Against Unique Dental, Gendron asserts further claims for breach of contract and quantum meruit/unjust enrichment (Counts 9 and 10, respectively). After discovery, Gendron moved for partial summary judgment on liability only as to Counts 1, 2, 3, and 5. ECF 47. After receiving the defendants' opposition and Gendron's reply, the Court held a hearing and took the motion under advisement. ECF 51, 53, 56.

## STANDARD OF REVIEW

Summary judgment is appropriate when, based upon the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). To prevail, the moving party must show that "there is no factual determination which a 'rational factfinder' could make as to the 'existence or nonexistence' of a fact that 'has the potential to change the outcome of the suit.'" *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4-5 (1st Cir. 2010)). Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant," but "need not credit 'conclusory allegations, improbable inferences, and unsupported speculation.'" *Dixon-Tribou*, 86 F.4th at 458 (quoting *Lahens v. AT&T Mobility Puerto Rico, Inc.*, 28 F.4th 325, 333 (1st Cir. 2022)). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

## DISCUSSION

### I.    <u>Misclassification Claim.</u>

Gendron contends that the undisputed record establishes, as a matter of law, that she was misclassified as an independent contractor while she was working for Unique Dental. The Commonwealth's independent contractor statute, M.G.L. c. 149, § 148B, "evinces the Legislature's broad, remedial intent 'to protect workers by classifying them as employees, and thereby grant them the benefits and rights of employment, where the circumstances indicate that they are, in fact, employees.'" *Patel v. 7-Eleven, Inc.*, 489 Mass. 356, 360 (2022) ("*Patel I*") (quoting *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 465 Mass. 607, 620 (2013)). To that end, it creates a presumption that "an individual performing any service" for an alleged employer "shall be" considered an employee. M.G.L. c. 149, § 148B(a); *see Patel I*, 489 Mass. at 360. To rebut that presumption, the employer bears the burden to demonstrate, by a preponderance of the evidence, the following three statutory prongs of what has come to be known at the "ABC test":

(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and

(2) the service is performed outside the usual course of the business of the employer; and,

(3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

M.G.L. c. 149, § 148B(a); *see Patel I*, 489 Mass. at 360. The employer's failure "'to satisfy any prong will result in the individual's classification as an employee.'" *Patel v. 7-Eleven, Inc.*, 494 Mass. 562, 567 (2024) ("*Patel II*") (quoting *Sebago v. Boston Cab Dispatch, Inc.*, 471 Mass. 321, 327 (2015)).

The defendants do not dispute that Gendron performed services for Dr. Kinjawi and Unique Dental. *See Patel II*, 494 Mass. at 567 & n.14 (the statutory term "performing any service" means "carrying out any labor in the interest, or under the direction, of the putative employer, usually (but not always) for remuneration"). Thus, the question before the Court is whether the defendants can show a genuine dispute of material fact concerning all three prongs of the ABC test. Gendron contends that she is entitled to summary judgment because any rational factfinder would conclude, based on the undisputed record, that she must prevail on the first prong because she was subject to Unique Dental's direction or control and, alternatively, that she must prevail on the second prong because the services she rendered were part of Unique Dental's usual course of business. The Court agrees that Gendron prevails as a matter of law on the second prong, and therefore does not address whether the evidence shows that she was free from Unique Dental's direction or control.

To prevail on the second prong of the ABC test, the putative employer must show that the service is performed outside its usual course of business. *See* M.G.L. c. 149, § 148B(a)(2). To determine the usual course of business, courts look to how the employer defines its business and "'whether the service the individual is performing is necessary to the business of the employing unit or merely incidental.'" *Sebago*, 471 Mass. at 333 (quoting An Advisory from the Attorney General's Fair Labor Division on M.G.L. c. 149, § 148B, Advisory 2008/1, at 6); *see also Carey v. Gatehouse Media Massachusetts I, Inc.*, 92 Mass. App. Ct. 801, 805-08 (2018). A "service need not be the sole, principal, or core product that a business offers its customers, or inherently essential to the economic survival of that type of business, in order to be furnished in the usual course of that business." *Carey*, 92 Mass. App. Ct. at 808.

Unique Dental is a dental practice and describes itself as such. Among the services that Gendron performed for Unique Dental were office management, including scheduling patients,

handling billing and copays, processing insurance claims, and overseeing the dental hygienists and administrative staff. She also performed patient care and dental hygiene services, including prophylaxis for adults and children, topical fluoride treatment, and gingivitis treatment. Unique Dental offers no serious argument that these services are not performed in the usual course of business of a dental practice. The role of a dental hygienist is necessary for, not incidental to, any dentist's business, as hygienists provide a portion of the dental care that patients purchase. The managerial tasks undertaken by Gendron—patient scheduling, claims processing, and billing—are likewise necessary components of any dental practice. No reasonable jury could conclude that these services fall outside the usual course of Unique Dental's business. *See Siciliano v. Cranberry Dental Assocs., Inc.*, No. 2083CV00233, 2022 WL 22888661, at *1, *3 (Mass. Super. Ct. Feb. 08, 2022) (dental practice employer failed to carry its burden on the second prong as to plaintiff who worked "as a front desk receptionist to answer phones, book appointments, file insurance claims, process payments, bill patients for services rendered and all the associated duties that are regular and usual for a front desk receptionist at a dental office" (quotation marks omitted)).

The defendants nevertheless maintain that Gendron's services fall outside the usual course of Unique Dental's business because they were undertaken for the purpose of creating a proposal on improving the productivity and functionality of the dental practice. This argument runs up against the Supreme Judicial Court's holding that intent plays no role in the misclassification analysis. As that Court explained in *Somers v. Converged Access, Inc.*, "[n]one of the statutory criteria speaks of the employer's intent; rather, all speak of the nature of the service provided." 454 Mass. 582, 591 (2009). Thus, even if the worker and employer agree that the worker should be classified as an independent contractor, the worker will be regarded as an employee under Massachusetts law unless the employer can establish all three elements of the ABC test. *Id.*

Because Section 148B "is a strict liability statute, . . . if an employer misclassifies an employee as an independent contractor," even when acting in good faith, "the employer must suffer the consequences." *Id.* Accordingly, even assuming favorably to the defendants that the evidence shows that Gendron's purpose in providing dental hygiene and managerial services was to create a proposal for improving the dental practice, that purpose does not alter the conclusion that she performed her services in the usual course of Unique Dental's business.

The defendants separately argue that because Gendron provided *other* services to Unique Dental—for example, she ordered new products for Unique Dental to sell, introduced the concept of comprehensive treatment planning, implemented the fluoride standard of care, and arranged demonstrations of teeth whitening products—the evidence shows a dispute of material fact on the second prong. This argument fails for multiple reasons. First, these services are also self-evidently part of the usual course of business of a dental practice. Second, the Court rejects the defendants' suggestion that when a worker strives to improve her workplace through new ideas and business strategies, such reforms are outside the employer's usual course of business. That rule would discourage employee innovation—an undesirable result for employers and employees alike—and finds no footing in the text or purpose of Section 148B.

Third, to the extent that the defendants argue that "most" of Gendron's work was related to enhancing the productivity and profitability of Unique Dental, rather than related to office management and patient care, they have not introduced evidence that creates a material dispute of fact on that issue. ECF 51, at 10. The defendants have pointed to no evidence that breaks down the percentage of time that Gendron devoted to the various services she performed for Unique Dental. The Dentrix time records simply reflect the times that Gendron "punched in" and "punched out" from work. *See* ECF 51-2. The Dentrix patient care records do demonstrate that Gendron devoted

13

significantly less time to hygiene care than the other dental hygienists, but do not reflect the amount of time she devoted to office management. *See* ECF 51-6. Dr. Kinjawi's deposition testimony, if anything, undermines his argument. When asked what tasks Gendron performed in her first week on the job, he testified that "[s]he was on the phone a lot" communicating with Unique Dental's phone company about a problem with its fax number; she scheduled patients; she talked with the hygienists about patient care; and she brought in "a couple of" dental company representatives. ECF 51-1, at 98-99. He could not remember Gendron performing any other duties in the "first couple of weeks that she worked for the practice," and he confirmed that her "duties stay[ed] roughly the same throughout the time [she] worked for the practice." *Id.* at 99. Construed in the light most favorable to the defendants, the record thus demonstrates that Gendron performed managerial and patient care services "on a regular or continuous basis" for Unique Dental. *Weiss v. Loomis, Sayles & Co., Inc.*, 97 Mass. App. Ct. 1, 8 (2020) (quotation marks omitted).

While Section 148B does not prevent a dental practice from working with someone as an independent contractor to observe its functions, interview its employees, and develop ideas to increase profitability, the evidence in this case shows that Gendron did far more than that for Unique Dental. Because no reasonable jury could find, based on the undisputed record, that Gendron worked outside the usual course of Unique Dental's business, Gendron was improperly classified as an independent contractor instead of as an employee, and is therefore entitled to summary judgment on Count 1.

## II.    Claim for Untimely and Incomplete Wages.

Gendron next contends that, because she was an employee rather than an independent contractor, Unique Dental violated M.G.L. c. 149, § 148 by failing to timely pay her the full wages she earned. The Massachusetts Wage Act requires employers to "pay weekly or bi-weekly each

such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week." M.G.L. c. 149, § 148. It further specifies that "any employee discharged from such employment shall be paid in full on the day of his discharge." *Id.* The statute "aims to 'protect wage earners from the long-term detention of wages by unscrupulous employers as well as [to] protect society from irresponsible employees who receive and spend lump sum wages.'" *Devaney v. Zucchini Gold, LLC*, 489 Mass. 514, 520 (2022) (quoting *Melia v. Zenhire, Inc.*, 462 Mass. 164, 170 (2012)). To that end, the Wage Act creates strict liability for employers, *see id.* at 521, and further deems the "'president and treasurer of a corporation and any officers or agents having the management of such corporation . . . to be the employers of the employees . . . within the meaning of [the statute],'" *Lynch v. Crawford*, 483 Mass. 631, 632 (2019) (quoting M.G.L. c. 149, § 148).

The defendants do not dispute that, if Gendron was an employee, they violated the Wage Act by failing to pay her weekly or bi-weekly. There were 19 days between her first and second check, 19 days between her second and third check, 26 days between her third and fourth check, and 23 days between her fourth and fifth check. Because Gendron has moved for summary judgment as to liability, but not damages, the Court's analysis ends there: The defendants have conceded they did not pay Gendron in a timely manner, and because the Wage Act creates strict liability, no reasonable jury could find that the defendants did not violate the timeliness requirements of the Wage Act. Furthermore, both Unique Dental and Dr. Kinjawi, as Unique Dental's President and Treasurer, are liable. *See* M.G.L. c. 149, §§ 148, 148B(d).

Similarly, the defendants do not dispute that Gendron was not paid "in full on the day of [her] discharge." M.G.L. c. 149, § 148; *see* ECF 50, ¶ 56. Dr. Kinjawi asserts that he mailed two checks to Gendron *after* her termination, though he acknowledges that the checks were never

cashed. But his mailing of checks to Gendron after her firing has no bearing on the determination

of liability, because "the express language of the Wage Act" is "clear and emphatic" that "'any

employee discharged from such employment,' such as the plaintiff, 'shall be paid in full on the

day of [her] discharge.'" *Reuter v. City of Methuen*, 489 Mass. 465, 470 (2022) (quoting M.G.L.

c. 149, § 148). Because the defendants do not dispute that they failed to pay Gendron in full on the

day of her discharge, and because the Wage Act creates strict liability, any reasonable jury would

find that the defendants violated the Wage Act in failing to pay Gendron in full on her final day of

work. Gendron is, accordingly, entitled to summary judgment as to liability on Count 2.

## III.    Overtime Compensation Claim.

Gendron next claims that she is entitled to summary judgment on Count 5 because Unique

Dental did not pay her overtime compensation when she worked more than 40 hours per week.

With exceptions not relevant here, the Massachusetts overtime statute provides that "no employer

in the commonwealth shall employ any of his employees in an occupation . . . for a work week

longer than forty hours, unless such employee receives compensation for his employment in excess

of forty hours at a rate not less than one and one half times the regular rate at which he is

employed." M.G.L. c. 151, § 1A. The purposes of this statute "are 'to reduce the number of hours

of work, encourage the employment of more persons, and compensate employees for the burden

of a long workweek.'" *Sullivan v. Sleepy's LLC*, 482 Mass. 227, 233-34 (2019) (quoting *Mullaly*

*v. Waste Mgmt. of Massachusetts, Inc.*, 452 Mass. 526, 531 (2008)).

Gendron is entitled to overtime compensation under this statute. She was an employee of

the defendants, and it is undisputed that she worked more than 40 hours per week for 11 of the

weeks in which she was employed by Unique Dental. ECF 50, ¶¶ 61-63. Further, the defendants

admitted in their answer that Unique Dental did not pay Gendron overtime compensation, at a rate

of 1.5 times her regular rate of pay, in the weeks during which she worked more than 40 hours. ECF 1, ¶ 86 (Complaint); ECF 7, ¶ 86 (Answer); *see* ECF 50, ¶ 66. The defendants nevertheless contend that Gendron is not entitled to overtime compensation because (1) they had no knowledge that Gendron was working more than forty hours a week, and (2) Gendron is not entitled to overtime compensation under M.G.L. c. 151, § 1A because she already earned more than the minimum wage. Both arguments fail.

In the context of overtime claims under M.G.L. c. 151, §§ 1A and 1B, "an employee must prove both that he incurred unpaid overtime work, and that the employer 'had actual or constructive knowledge that he was working overtime.'" *Vitali v. Reit Mgmt. & Rsch., LLC*, 88 Mass. App. Ct. 99, 103 (2015) (quoting *Prime Commc'ns, Inc. v. Sylvester*, 34 Mass. App. Ct. 708, 709 (1993)). "The knowledge inquiry requires an assessment of what the employer knew or should have known," and turns on the employee's ability to marshal evidence "that the employer had actual or constructive knowledge of the unpaid overtime." *Id.* at 103-04. Notably, "[t]o the extent that an employee has reported his hours in accordance with the employer's mandated timekeeping procedures, the employer's knowledge of those hours is not in doubt." *Id.* at 104. Here, it is undisputed that the defendants had constructive knowledge of Gendron's hours through her properly reported Dentrix time records. Gendron's complaint alleged, and the defendants' answer admitted, that "Unique Dental had actual and/or constructive knowledge of Plaintiff's hours of work, including without limitation because Unique Dental kept time records for Plaintiff." ECF 1, ¶ 76 (Complaint); ECF 7, ¶ 76 (Answer). The defendants now dispute, based on Dr. Kinjawi's deposition testimony, that he had *actual* knowledge that Gendron had worked over 40 hours per week until after she was terminated. *See* ECF 50, ¶¶ 64, 95. The defendants do not, however, dispute that they had *constructive* knowledge, based on Gendron's Dentrix records, that she

repeatedly worked over 40 hours per week. In light of the defendants' answer, that fact is admitted, and is sufficient to demonstrate the defendants' knowledge of Gendron's overtime work. *See Harrington*, 610 F.3d at 31 (instructing courts to "parse the particular admission in each case"); *Vitali*, 88 Mass. App. Ct. at 104.

Trying a different tack, the defendants maintain that because Gendron earned more than minimum wage, and there was no agreement between Gendron and Dr. Kinjawi on her rate of pay, she is not entitled to overtime compensation. This argument is flatly inconsistent with the statute. True, the parties dispute whether Gendron and Dr. Kinjawi came to an oral agreement about her rate of compensation and what Gendron's hourly rate of pay should have been. *See, e.g.*, ECF 51-1, at 149 (Dr. Kinjawi testifying that he estimated Gendron's rate at $41 an hour in his post-termination calculations); ECF 51-9, at 4 (Gendron arguing, in post-termination correspondence, that she should have been paid $58 an hour). And the term "regular rate" in M.G.L. c. 151, § 1A is determined based on "[t]he amount that an employee is regularly paid for each hour of work." 464 Code Mass. Regs. 27.02; *see Sullivan*, 482 Mass. at 231. Whether an oral agreement between Dr. Kinjawi and Gendron existed, and what Gendron's appropriate rate of compensation should have been, will be questions for the jury. But once that is decided, Massachusetts law is clear that Gendron is entitled to 1.5 times that "regular rate" for any hours over 40 worked each week. *See* M.G.L. c. 151, § 1A; *Somers*, 454 Mass. at 584 (employers "may not . . . reduce their obligation to make overtime payments based on the argument that, had they known they were obliged to pay overtime, they would have paid the employee a lower wage for the first forty hours worked in a week").[3] Whether or not Gendron was paid more than minimum wage has no bearing on that

---

[3] The defendants cite *Sullivan v. Sleepy's LLC* for the proposition that, absent an agreement setting a rate of pay between the parties, there can only be an overtime violation if the total pay would violate a minimum-wage employee's rights under M.G.L. c. 151, § 1A. ECF 51, at 13 (citing

calculation. Because Gendron was an employee of the defendants who worked over 40 hours per week during some weeks of her employment, and because she was not paid overtime compensation for that work, she is entitled to summary judgment as to liability on Count 5.

## IV.    **Retaliation Claim.**

Finally, Gendron contends that she is entitled to summary judgment on her claim of retaliation under M.G.L. c. 149, § 148A. That statute provides: "No employee shall be penalized by an employer in any way as a result of any action on the part of an employee to seek his or her rights under the wages and hours provisions of this chapter," and "[a]ny employer who discharges or in any other manner discriminates against any employee because such employee has made a complaint to the attorney general or any other person . . . shall have violated this section." M.G.L. c. 149, § 148A. The purpose of the statute is "to encourage enforcement of the wage laws by protecting employees who complain about violations of the same." *Smith v. Winter Place LLC*, 447 Mass. 363, 368 (2006); *see also Fernandes v. Attleboro Hous. Auth.*, 470 Mass. 117, 125 (2014) ("To ensure that employees are not penalized for asserting their rights to earned wages, the Legislature included an antiretaliation clause in the Wage Act, G.L. c. 149, § 148A, to protect employees . . . who complain about violations of the statute.").

To prevail on a claim of retaliation under Section 148A, Gendron must demonstrate that (1) she "engaged in conduct that the . . . Massachusetts wage and tips law protect[s]," (2) the defendants subjected her to an adverse employment action, and (3) she was subject to the adverse employment action "because of [her] protected conduct." *Travers v. Flight Servs. & Sys., Inc.*, 808 F.3d 525, 531 (1st Cir. 2015). "The third element requires there to be 'a causal connection . . .

---

*Sullivan*, 482 Mass. at 231). *Sullivan* is inapposite because it announced a rule for 100% commission employees, not employees without written employment agreements. *See* 482 Mass. at 238.

between the protected conduct and the adverse action.'" *Rooney v. Leerink Partners, LLC*, No. 1:24-cv-11165-AK, 2025 WL 417785, at *7 (D. Mass. Feb. 6, 2025) (quoting *Blackie v. Maine*, 75 F.3d 716, 723 (1st Cir. 1996)). Gendron contends that, as a matter of law, she prevails on all three prongs of the test. In her view, she engaged in protected conduct by complaining to Tyler that Dr. Kinjawi and Unique Dental were underpaying her and paying her only sporadically, and the evidence shows that Dr. Kinjawi fired her because she made those complaints to Tyler. The defendants do not dispute that Gendron was subject to an adverse employment action when she was fired, but they contend that a genuine dispute of material fact exists as to whether Gendron engaged in protected conduct and whether she was terminated because of that conduct.

The question whether an employee engages in protected conduct under Section 148A by complaining to "persons unrelated to either the business enterprise or the enforcement of the wage laws" remains open in Massachusetts. *Winter Place*, 447 Mass. at 367 (reserving on that question). Based on the text and remedial purpose of the statute, the Court concludes that Massachusetts courts would deem such complaints about wage violations to be protected conduct. As a remedial statute, Section 148A, like Section 148B, is "entitled to liberal construction." *Depianti*, 465 Mass. at 620 (quotation marks omitted). And the Supreme Judicial Court has stressed that "[e]mployment statutes in particular are to be liberally construed, with some imagination of the purposes which lie behind them." *Id.* (quotation marks omitted). Consistent with its protective purpose, *see Fernandes*, 470 Mass. at 125, the text of Section 148A uses markedly broad language. It forbids employers to penalize employees "as a result of *any* action" to vindicate rights under the wage laws. M.G.L. c. 149, § 148A (emphasis added). And it declares that an employer engages in unlawful retaliation if it terminates an employee "because such employee has made a complaint to the attorney general or *any* other person." *Id.* (emphasis added). Last year, the Supreme Judicial

Court construed the term "any" in Section 148B, the neighboring statute, to have "'an expansive meaning, that is, one or some indiscriminately of whatever kind,' signaling the breadth" the Legislature intended to convey. *Patel II*, 494 Mass. at 567 n.14 (quoting *Dep't of Hous. & Urb. Dev. v. Rucker*, 535 U.S. 125, 131 (2002)). Having twice used the term "any" in Section 148A, the Legislature likewise conveyed its intent to cover complaints about wage law violations to "any other person," including individuals, like Tyler, unrelated to the business or to enforcement of those laws. *See Psy-Ed Corp. v. Klein*, 459 Mass. 697, 708 (2011) (construing the term "any person" in Chapter 151B's anti-retaliation provision broadly, because "in light of the c. 151B's broad remedial purposes, it would be an error to imply . . . a limitation where the statutory language does not require it"); *Commonwealth v. Smith*, 431 Mass. 417, 424 (2000) ("[S]tatutes which relate to a common subject matter 'should be construed together so as to constitute an harmonious whole.'" (quoting *Board of Educ. v. Assessor of Worcester,* 368 Mass. 511, 513-14 (1975))).

The defendants contend that, even if Gendron's complaints to Tyler are covered by the text of Section 148A, her complaints do not constitute protected conduct because her complaints were not based on a reasonable, good faith belief of a statutory violation. To "maintain an actionable claim under § 148A, a plaintiff is not obliged to successfully prove her right to seek recovery of the untimely paid 'wages' in question," but she must establish that she "reasonably believed the remuneration in question fell within the scope of the Wage Act." *Fraelick v. PerkettPR, Inc.*, 83 Mass. App. Ct. 698, 706 (2013) (citing *Abramian v. President & Fellows of Harvard College*, 432 Mass. 107, 121 (2000)). This is not a high bar. *See Gillis v. Lowell Health Care Ctr.*, No. 16-cv-10497-NMG, 2016 WL 4074138, at *3 (D. Mass. July 29, 2016) ("[T]he law does not require an accurate or technically precise belief, but only a reasonable belief that said right was violated." (emphasis omitted)); *cf. Ray v. Ropes & Gray LLP*, 799 F.3d 99, 108 (1st Cir. 2015) (Title VII's

anti-retaliation provision "protects an employee for . . . informally opposing an employment activity that *might* violate Title VII." (emphasis added)).

Here, the undisputed evidence is that Gendron complained to Tyler about two perceived violations of the wage laws. She complained (1) that she was being paid only sporadically, in a "piecemeal" fashion, and (2) that the defendants were underpaying her, such that Tyler believed that Gendron might not have been making minimum wage. ECF 51-5, at 62, 93; *see* ECF 50, ¶ 46. The defendants object that Gendron could not have reasonably believed that she was not making minimum wage, because she did not calculate in 2021 whether her wages in fact amounted to minimum wage, nor does she know what the minimum wage was in 2021. But Gendron also complained to Tyler regarding the sporadic nature of her payments, and the defendants do not contend that this complaint was not based on a good faith belief of a wage law violation. Indeed, as discussed, Dr. Kinjawi's irregular payments to Gendron *did* violate M.G.L. c. 149, § 148. *See Fraelick*, 83 Mass. App. Ct. at 708 ("Wages must be paid both in a timely manner and in full."). The defendants have thus failed to identify a dispute of material fact regarding whether Gendron's complaint to Tyler was rooted in a good faith belief that the defendants were violating her rights under the wage laws. Accordingly, the Court concludes that Gendron has met her burden, as a matter of law, to show that she engaged in protected conduct.

To prevail on summary judgment, Gendron must also demonstrate, as a matter of law, that Dr. Kinjawi fired her because of her complaint about wage law violations to Tyler. M.G.L. c. 149, § 148A. This requires her to demonstrate that Dr. Kinjawi's "'desire to retaliate against [her] was a determinative factor in [his] decision to terminate [her] employment.'" *Winter Place*, 447 Mass. at 364 n.4 (quoting *Abramian*, 432 Mass. at 121). "Although a 'determinative cause' of an adverse employment decision is a 'but for' cause, it need not be 'the only cause.'" *Edwards v.*

*Commonwealth*, 488 Mass. 555, 573 (2021) (citing *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 506 n.19 (2001)). While the question is close, the Court concludes that Gendron has not met her burden, because a reasonable jury could conclude that her complaint to Tyler about wage violations was not a determinative factor in Dr. Kinjawi's decision to terminate her. At his deposition, Dr. Kinjawi gave three reasons for his reaction to Tyler's accusations in the June 11, 2021 meeting and his subsequent decision to terminate Gendron: (1) he was offended by the way Tyler conveyed her criticisms of him, (2) he thought that Gendron might have been sharing confidential information about his business with Tyler, and (3) he thought it inappropriate for Gendron to speak to someone other than him about her wage complaints. ECF 51-1, at 141-43. Based on the third reason, a reasonable jury could conclude that Gendron's protected conduct, and Dr. Kinjawi's desire to retaliate against her for that conduct, was a determinative factor in the decision to fire her. But if it accepted only the first reason, the jury could find that Dr. Kinjawi was upset that he was being blamed for the state of his business at a meeting convened to discuss ways to improve that business. Similarly, if it accepted only the second reason, the jury could find that Dr. Kinjawi fired Gendron because he feared that she was sharing confidential business information with Tyler. Drawing all inferences in favor of the defendants, as the nonmoving parties, the Court cannot say that a reasonable jury could only conclude that Gendron's protected conduct was a but-for cause of her termination. Her motion for summary judgment on the retaliation claim is accordingly denied. It will be for the jury to determine whether there exists a sufficient causal nexus between Gendron's protected conduct and her termination to prevail on her retaliation claim.

## CONCLUSIONS AND ORDERS

For the foregoing reasons, the plaintiff's partial motion for summary judgment, ECF 47, is GRANTED in part and DENIED in part. The plaintiff is entitled to judgment as to liability on Counts 1, 2, and 5. The plaintiff's motion is denied with respect to Count 3.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: February 25, 2025                    UNITED STATES DISTRICT JUDGE